FILED
2024 Apr-04  PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **DON SHARPE,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:21-cv-01267-MHH** |
| | } | |
| **NORFOLK SOUTHERN** | } | |
| **CORPORATION,** | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Don Sharpe has sued his former employer, defendant Norfolk Southern Corporation, for race discrimination. Mr. Sharpe is Black. He contends that Norfolk Southern terminated his employment because of his race in violation of the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* and 42 U.S.C. § 1981. Norfolk Southern has moved for summary judgment on Mr. Sharpe's claims. The Court has denied Norfolk Southern's motion. (Doc. 62).

This opinion explains the reasons for the Court's decision. First, the Court sets forth the standard for summary judgment motions under Rule 56 of the Federal Rules of Civil Procedure. Then, applying that standard, the Court describes the parties' evidence, presenting the evidence in the light most favorable to Mr. Sharpe.

Finally, the Court examines the evidence under the legal precedent that governs Mr. Sharpe's race discrimination claims.

## I.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, a district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To demonstrate a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). When considering a summary judgment motion, a district court must view the evidence in the record and draw reasonable inferences from the evidence in the light most favorable to the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015). Because Mr. Sharpe is the non-moving party, the Court views the evidence in the light most favorable to him.

## II.

Mr. Sharpe worked in Norfolk Southern's Mechanical Department from June 2008 until his termination on June 1, 2020. (Doc. 41-1, p. 1, ¶ 1). During his

12-year tenure with Norfolk Southern, Mr. Sharpe received 13 disciplinary write-ups. One of the 13 resulted in his termination and reinstatement on a "last chance" basis. (Doc. 31-2, pp. 9–10). Mr. Sharpe received the discipline in 2017 because he did not follow his supervisor's instruction and he tested positive for alcohol while on duty. (Doc. 31-2, p. 9; Doc. 31-7, p. 9, ¶ 16). Norfolk Southern reinstated Mr. Sharpe on a "last chance" basis after Mr. Sharpe completed the company's Drug and Rehabilitation (DARS) program. (Doc. 31-7, p. 9, ¶ 16). As part of this "last chance" agreement, Mr. Sharpe acknowledged that a "future proven case of discipline involving a serious rule violation and/or conduct unbecoming an employee [would] result in dismissal in all capacities without right of appeal." (Doc. 31-8, p. 92; Doc. 31-7, p. 9, ¶ 16). As the Court discusses below, Mr. Sharpe was disciplined several times following the 2017 "last chance" incident.

In the latter part of 2019, Mr. Sharpe moved from the third shift to the second shift and began working under the supervision of General Forman Jeremy White and Senior General Forman Benjamin Morton-Black. (Doc. 31-1, pp. 13–14, tpp. 42, 44–46; Doc. 41-1, p. 1, ¶ 1). Mr. White testified that Mr. Morton-Black had a list of employees that he felt "needed to go," and Mr. Sharpe was at "the top of the list." (Doc. 57-1, p. 14, tp. 49). Mr. White described conversations in which Mr. Morton-Black used the "N" word to refer to Mr. Sharpe and told Mr. White repeatedly that they "need[ed] to find a way to get rid of" Mr. Sharpe. (Doc. 57-1, p. 14, tpp. 47–

48; p. 20, tp. 71; p. 21, tpp. 74–75; p. 22, tp. 78).   Mr. White testified that Mr. Morton-Black "used [the "N" word] frequently.  It was a normal part of [Mr. Morton-Black's] vocabulary.  [Mr. Morton-Black] referred to Sharpe prior to this as a stupid nigger that can't do anything right."  (Doc. 41-2, p. 12, tp. 38).[1]

On April 16, 2020, Mr. White attended the fuel ramp safety meeting at the beginning of the second shift.  (Doc. 57-1, p. 6, tp. 14).  Approximately 10 minutes after the meeting ended, Mr. White observed Mr. Sharpe in the breakroom using his cellphone; Mr. Sharpe was warming food.  (Doc. 57-1, p. 6, tp. 14; Doc. 41-1, p. 3, ¶ 4).   Mr. White believed Mr. Sharpe's conduct violated Norfolk Southern's cellphone policy, so he called Mr. Morton-Black to discuss how to handle the situation.  (Doc. 57-1, p. 8, tp. 23, p. 10, tpp. 30–31).  Mr. Morton-Black quickly joined Mr. White to discuss the matter in person.  (Doc. 41-2, p. 8, tp. 25).  After Mr. White reported his observations, Mr. Morton-Black "chuckled, patted [Mr. White] on the shoulder" and said, "finally got that nigger."  (Doc. 41-2, p. 9, tp. 26; *see also* Doc. 57-1, p. 11, tpp. 36-37).   Mr. Morton-Black instructed Mr. White to send

---

[1] Mr. White stated that Mr. Morton-Black "definitely favored the white race" because Mr. Morton-Black "did not speak disparagingly about white individuals as he did that of black individuals." (Doc. 57-1, p. 14, tp. 48).  Mr. White testified that Mr. Morton-Black once commented that he (Mr. Morton-Black) was "overran" with Black individuals after moving to Alabama from Vermont. (Doc. 57-1, p. 14, tp. 47).  According to Mr. White, "there were a couple of black individuals on first shift that were – he had referred to with the same – the same term.  He called them stupid niggers and just couldn't understand why black people had to be so dumb is the way he put it." (Doc. 41-2, p. 12, tp. 38).

Mr. Sharpe home and to charge Mr. Sharpe with a cardinal rule violation. (Doc. 57-1, p. 11, tp. 35, p. 20, tp. 70). Cardinal rules are "rules that have been identified by the mechanical department and emphasized due to their potential impact on safety. Depending on the circumstances associated with a particular violation, the violation of a cardinal rule may be treated as a serious or major offense." (Doc. 31-7, pp. 5–6, ¶ 8). Mr. Morton-Black said to Mr. White, "[b]ased on [Mr. Sharpe's] background, I'm sure he probably won't return." (Doc. 57-1, p. 11, tpp. 35–36).

Following Mr. Morton-Black's direction, Mr. White confronted Mr. Sharpe about his cellphone use and sent him home on April 16th without pay. (Doc. 57-1, p. 8, tpp. 24–25; Doc. 41-1, pp. 3–4, ¶ 4). On April 22, 2020, Mr. Sharpe received a charge letter directing him to attend a formal investigation hearing to "determine [his] responsibility, if any, in connection with [his] being observed to be in possession of and/or using a personal electronic device while located in the Fuel Ramp breakroom at approximately 15[:]35 on Thursday April 16, 2020 while assigned as a Laborer on 2nd shift at Birmingham Diesel Shop, Birmingham, Alabama." (Doc. 31-12, p. 61; Doc. 57-2, p. 60). Mr. White signed the letter as the charging officer. (Doc. 31-12, p. 61; Doc. 57-2, p. 60).

Mr. Sharpe's investigation hearing was Mr. White's first and only as a charging officer. (Doc. 57-1, p. 12, tp. 38; p.15, tp. 52). Before the hearing, Mr. White had "a dozen" conversations with Mr. Morton-Black in which

Mr. Morton-Black told him how to prepare for the hearing, which documents to use, and who to contact to serve as the hearing officer.  (Doc. 57-1, p. 12, tp. 39). According to Mr. White, Mr. Morton-Black scheduled his "friend" Brian Yeager, a Senior General Forman in Macon, Georgia, to serve as the hearing officer for Mr. Sharpe's hearing.  (Doc. 41-2, p. 10, tp. 33; *see also* Doc. 57-1, p. 12, tp. 39; Doc. 31-9, pp. 6–7, ¶ 11; Doc. 31-11, p. 4, ¶ 7).[2]  Mr. Morton-Black gave Mr. White Mr. Yeager's contact information and told Mr. White "to get with him and fill him in" before the hearing.  (Doc. 41-2, p. 11, tp. 34).  When asked whether Mr. Morton-Black "instruct[ed] [him], to tell Mr. Yeager to be sure that this man, Sharpe, got fired," Mr. White answered, "[y]es, he did."  (Doc. 57-1, p. 19, tp. 68).

Mr. White testified that Mr. Morton-Black made "several changes" to a statement that Mr. White prepared for Mr. Sharpe's hearing.  Mr. Morton-Black revised the "rules that were in violation."  (Doc. 57-1, pp. 12–13, tpp. 41–42; *see also* Doc. 41-2, p. 11, tpp. 34–35).  Mr. Morton-Black told Mr. White to charge Mr. Sharpe with violating Operating Rule 5, which prohibits the use of electronic devices when it would interfere with an employee's performance of duties.  Norfolk

---

[2]   In his declaration, Mr. Morton-Black states that "there were approximately three qualified Hearing officers near Birmingham; Brian Yeager, Sr. General Forman in Macon, Georgia was one of them."  (Doc. 31-9, p. 6, ¶ 11).  Both Mr. Morton-Black and Mr. Yeager assert that they did not have substantive discussions regarding Mr. Sharpe's charged conduct when Mr. Morton-Black asked Mr. Yeager to serve as the hearing officer.  (Doc. 31-9, pp. 6–7, ¶ 11; Doc. 31-11, pp. 4–5, ¶ 7).

Southern regards OR-5 as a cardinal rule. (Doc. 57-1, p. 18, tp. 63; Doc. 31-7, p. 5, ¶ 8; Doc. 31-8, pp. 13–17).[3]

Mr. White had a few phone conversations with Mr. Yeager before Mr. Sharpe's hearing to "fill [Mr. Yeager] in on what has happened," to provide

---

[3] OR-5 provides:

**5. Electronic Devices**

**(a) General Use**

The use of any electronic device is prohibited if that use will interfere with any employee's performance of duties.

No individual located in the cab of a controlling locomotive may use an electronic device unless a job safety briefing is conducted with all crew members and it is determined that such usage will not interfere with any employee's performance of duties.

**(b) Personal Electronic Devices**

All employees must have all personal electronic devices, including earpieces, smartwatches, and fitness trackers, turned off and stored out of sight and not on the employee's person:

- When on a moving train or engine.
- When in the foul of the track or within 4 feet of the nearest rail,
- When operating On-track equipment on the rail,
- When any member of the crew is on the ground or on rail equipment.
- When any other employee is assisting with preparation or repairs to their train.
- Within the Network Operations Center (NOC), dispatcher work stations, and operator and yardmaster offices
- Within the confines of a shop where PPE is required.

Additionally, when on a stopped train or engine, train & engine service employees, utility employees (regardless of craft when attached as a crew member), and employees performing hostler and hostler helper duties are prohibited from using personal electronic devices for any function other than for voice and text communication or to refer to a rule, timetable, special instruction, or job aid.

(Doc. 31-8, pp. 14–15).

"background on [Mr. Sharpe]," and to discuss whether Mr. White "wanted to keep [Mr. Sharpe] or not" and "how strongly" Mr. White felt about the charges. (Doc. 57-1, p. 13, tpp. 43–44; p. 15, tp. 51–52).   Mr. White told Mr. Yeager that he did not want to keep Mr. Sharpe because he felt that Mr. Sharpe was a bad employee, but that "[i]t was not [his] initial recommendation to have Mr. Sharpe terminated" because "the violation at hand was not worthy of termination."  (Doc. 57-1, p. 13, tpp. 44–45).   Mr. Yeager changed some of the wording in Mr. White's opening statement and advised him on what rules to use.  (Doc. 57-1, p. 13, tp. 43; p. 18, tp. 63; *see also* Doc. 41-2, p. 11, tpp. 34–35).

On May 7, 2020, Mr. Yeager held an investigation hearing with Mr. White, Mr. Sharpe, and Mr. Sharpe's union representative.  (Doc. 31-12, p. 59; Doc. 57-2, p. 58).   Mr. White gave an opening statement in which he described his observations of Mr. Sharpe's conduct on April 16, 2020, and stated that Mr. Sharpe's conduct violated OR-5.  (Doc. 31-12, p. 62; Doc. 57-2, p. 61).[4]   Mr. White submitted exhibits

---

[4] Mr. White's full opening statement was as follows:

> On April 16th, 2020, I attended the fuel ramp safety meeting. At the completion of fuel ramp safety meeting, there was a brief period of talk and discussion.  At this particular safety meeting, I addressed the crowd about arriving on time, and ready to work. After a short stay of approximately 10 minutes, everyone departed, and began to focus on their assignments. I walked around to the gang leader's office at that time.  I was having a discussion with the gang leader about power needed, and trains that needed to be completed.  I turned around, and looked through the window of the breakroom, which is directly behind the gang leader's office, and noticed Mr. Sharpe sitting at the table with food prepared, and his personal cell phone in his hand.  I immediately looked at my clock to see what time it was, 15[:]35 is what my clock read.  Eye contact was made through the window between Mr. Sharpe

that included a three-page packet describing OR-5; a copy of the Rule compliance Focus Topic mentioned during a March 14, 2020 safety meeting; and a copy of the general notice from the Safety and General Conduct Rules dated January 1, 2019. (Doc. 31-12, pp. 63–65, 67, 69). Mr. White and Mr. Sharpe provided conflicting testimony about whether Mr. Sharpe was on a break and whether Mr. Sharpe had received an assignment before Mr. White saw him using his cellphone in the breakroom. (Doc. 31-12, pp. 40–48; Doc. 57-2, pp. 39–47). Relying on the collective bargaining agreement between Mr. Sharpe's union and Norfolk Southern, Mr. Sharpe's union representative argued that the use of a cellphone in a breakroom "would not constitute a serious offense" that "would warrant being removed from

---

and myself. He then laid his phone down, and walked over to the microwave, where he removed a clear plastic container in what appeared to be soup. Mr. Sharpe then sat back down and picked his cell phone up yet again. This was in violation of OR-5.

At 15[:]41 I notified SGF BMB of my observations. I explained to him in detail the events that had taken place. Mr. Sharpe was sent home for a cardinal rule violation. I explained to Mr. Sharpe that I did not feel he was focused on the task at hand. We do a lot of heavy and serious work and his full, undivided attention was not only required but demanded.

Mr. Sharpe is more than aware of the rules that were broken. There have been slides in multiple safety meetings concerning his rule violations. On March 2nd 2020, Mr. Sharpe was paid and attended the safety meeting where local bulletin 005 was presented [enter payroll and rule]. On March 14th 2020, safety meeting rule focus topic was rule compliance. It covered personal electronic devices and when is an acceptable time to use them. [enter payroll sheet and rule].

(Doc. 31-12, p. 62; Doc. 57-2, p. 61).

service" and that Mr. Sharpe was not in an area where PPE was required pursuant to the rules Mr. White cited.  (Doc. 31-12, pp. 52–53; Doc. 57-2, pp. 51–52).

On June 1, 2020, Mr. Yeager sent Mr. Sharpe a letter stating:  "A thorough review of the testimony contained in the transcript and the evidence presented during the investigation clearly reflects that you are guilty as charged.  You are hereby dismissed from all service with the Norfolk Southern Railway Company and its affiliates."  (Doc. 31-12, p. 71).

After Mr. Sharpe's termination, Mr. White testified that Mr. Sharpe's use of a cellphone on April 16, 2020 was not a violation of OR-5 because "OR-5 is not applicable in a breakroom or non PPE areas."  (Doc. 57-1, p. 10, tp. 31).  When asked why he charged Mr. Sharpe with violating OR-5, Mr. White testified that "OR-5 was the rule that we used to charge anyone on their cell phone" and "[t]hat was the rule I chose to charge him with."  (Doc. 57-1, p. 10, tp. 32).  Mr. White also testified that Mr. Morton-Black and Mr. Yeager told him to use OR-5.  (Doc. 57-1, p. 10, tpp. 31–32; p. 18, tp. 63).  According to Mr. White, he sent Mr. Sharpe home for violating a cardinal rule even though Mr. White's conduct did not rise to a cardinal rule violation because he "was told to charge [Mr. Sharpe] with a cardinal rule violation."  (Doc. 57-1, p. 20, tp. 70).  Mr. White believed his job would be in jeopardy if he did not charge Mr. Sharpe with a cardinal rule violation.  (Doc. 57-1, p. 20, tpp. 70–71).  When asked whether "Norfolk Southern supervisors [are]

10

expected to lie to comply with their bosses' wishes," Mr. White answered affirmatively. (Doc. 57-1, p. 20, tp. 71). Finally, Mr. White testified that he believed Mr. Sharpe's investigation hearing was biased, unfair, and unjust because Mr. Sharpe's "fate was decided over a phone call" between himself and Mr. Yeager. (Doc. 57-1, p. 15, tpp. 52–53). Mr. White stated that he "communicated with the judge, jury, and executioner prior to the trial." (Doc. 57-1, p. 15, tpp. 52–53).

### III.

Title VII prohibits an employer from discriminating against an employee based on his race. 42 U.S.C. § 2000e-2(a)(1). Section 1981 similarly prohibits intentional race discrimination in employment. 42 U.S.C. § 1981(a); *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999). Courts typically evaluate Title VII and § 1981 claims together because the analytical framework for intentional discrimination claims under the two statutes is the same. *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023). To survive summary judgment on these claims, a plaintiff must present sufficient evidence to create a triable issue concerning the employer's discriminatory intent. *Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).

When a plaintiff relies on circumstantial evidence to prove intent, he may use the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), or he may identify a convincing mosaic of circumstantial

evidence.[5]   Mr. Sharpe argues that he has presented evidence to satisfy both standards.

The *McDonnell Douglas* framework requires a plaintiff to establish a *prima facie* case that creates a presumption of unlawful discrimination.  *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1321 (11th Cir. 2023).  To establish a *McDonnell Douglas prima facie* case of employment discrimination, a plaintiff must show that he was member of a protected class, he was subjected to an adverse employment action, he was qualified for the job, and his employer treated similarly situated employees outside his class more favorably.  *Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (*en banc*) (*Lewis I*).  If a plaintiff meets his initial burden, the employer may rebut the presumption by identifying a legitimate, nondiscriminatory reason for its employment action.  *Phillips*, 87, F.4th at 1321.  If

_____

[5] In his summary judgment brief, Mr. Sharpe argues that Mr. Morton-Black's racist comments constitute direct evidence of discriminatory intent.  (Doc. 43, pp. 27–31).  The Eleventh Circuit has explained that "[w]hile statements made by a decisionmaker—*i.e.*, the one who ultimately fired, demoted, or punished the plaintiff—may constitute direct evidence, *see, e.g.*, *EEOC v. Alton Packaging Corp.*, 901 F.2d 920, 923 (11th Cir. 1990), 'remarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination,' *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)."  *Harris v. Pub. Health Tr. of Miami-Dade Cnty.*, 82 F.4th 1296, 1301 (11th Cir. 2023); *see also Robertson v. Riverstone Communities, LLC*, 849 Fed. Appx. 795, 803 (11th Cir. 2021) (alleged racist statements made by plaintiff's supervisor were not direct evidence where the supervisor was not the sole or ultimate decisionmaker with respect to the plaintiff's termination).  Mr. Sharpe acknowledges that Mr. Yeager issued the decision to terminate him.  (Doc. 43, pp. 27–33).  The Eleventh Circuit has not decided whether the cat's paw theory applies so as to permit the Court to consider whether Mr. Morton-Black's racist remarks are direct evidence of Norfolk Southern's discriminatory intent.  *Harris*, 82 F.4th at 1301.  The Court will not consider the legal question in this opinion because Mr. Sharpe has presented sufficient circumstantial evidence of discriminatory intent to survive Norfolk Southern's motion for summary judgment.

the employer meets this light burden, then the burden returns to the plaintiff to show that the employer's proffered reason is pretext for discrimination. *Phillips*, 87, F.4th at 1321.

Norfolk Southern challenges only the fourth element of Mr. Sharpe's *prima facie* case. Norfolk Southern argues that Mr. Sharpe has not shown that the railroad treated a similarly situated employee outside of Mr. Sharpe's protected class more favorably than Mr. Sharpe. For purposes of the fourth element of the *McDonnell Douglas prima facie* case, a comparator must be "similarly situated" to the plaintiff "in all material respects." *Lewis I*, 918 F.3d at 1224. Ordinarily, a similarly situated comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff;" "will have been subject to the same employment policy, guideline, or rule as the plaintiff;" "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff;" and "will share the plaintiff's employment or disciplinary history." *Lewis I*, 918 F.3d at 1227–28 (citations omitted).

Mr. Sharpe identified David Paone as his comparator. Norfolk Southern contends that Mr. Paone is not a proper comparator because Mr. Paone "did not share the same extensive disciplinary history as [Mr. Sharpe], was subject to a different disciplinary policy pursuant to a different [collective bargaining agreement] than [Mr. Sharpe], and accepted responsibility and requested a waiver." (Doc. 33, p. 19

(footnote omitted); *see also* Doc. 58, pp. 8–9).   Mr. Sharpe argues that while Mr. Paone was subject to a different CBA, he and Mr. Paone "were subject to the same discipline policies and procedures when it came to the use of electronic devices," (Doc. 43, p. 35), and Mr. Paone's disciplinary history over six years is comparable to Mr. Sharpe's 12-year disciplinary record, (Doc. 43, p. 37).

Viewed in the light most favorable to Mr. Sharpe, the evidence shows that Mr. Sharpe and Mr. Paone are similar in that they both were subject to the same safety rules, general conduct rules, and operating rules—including OR-5—and were under the supervision of Mr. White and Mr. Morton-Black.  Mr. White charged both for using cellphones in violation of OR-5.  Mr. Sharpe's and Mr. Paone's disciplinary histories are distinguishable because though Mr. Sharpe and Mr. Paone both averaged one disciplinary per year while working for Norfolk Southern, Norfolk Southern terminated Mr. Sharpe and reinstated him on a "last chance" basis, and Mr. Paone was not reinstated to work on a "last chance" basis as discipline for any of his rule violations.  *Griffin v. Gen. Elec. Aviation*, 545 F. Supp. 3d 1232, 1237 (M.D. Ala. 2021) (plaintiff did not establish comparator was "similarly situated" where there was no evidence that the employer had advised the comparator, as the employer had informed the plaintiff, that future violations of company policy would result in

termination).[6] Because Mr. Sharpe has not identified evidence that Norfolk Southern treated similarly situated employees outside his class more favorably, his race discrimination claim fails at step one of the *McDonnell Douglas* burden-shifting framework.

Turning then to the convincing mosaic test, a plaintiff "will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *see also Lewis I*, 918 F.3d at 1220 n.6. "[N]o matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper." *Smith*, 644 F.3d at 1328; *see also Tynes v. Fla. Dep't of Juv. Just.*, 88 F.4th 939, 946–47 (11th Cir. 2023). "A plaintiff may establish a convincing mosaic [of circumstantial evidence] by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of

---

[6] Mr. White testified that Mr. Paone was on the list of employees that Mr. Morton-Black wanted to terminate. (Doc. 57-1, pp. 14–15, tpp. 49–50). After telling Mr. Morton-Black about Mr. Paone's cellphone use, Mr. White sent Mr. Paone home and charged him with a violation of OR-5. (Doc. 57-1, p. 16, tp. 65; 31-9, p. 8, ¶ 17). When Mr. Paone was charged with the OR-5 violation, he had received six disciplinary write-ups over the six years that he had worked for Norfolk Southern. (Doc. 31-8, p. 47). Before Mr. Paone's investigation hearing, Mr. Morton-Black gave Mr. Paone a leniency waiver, permitting Mr. Paone to forgo an investigation hearing and accept responsibility for the charge in exchange for a 30-day suspension. (Doc. 31-8, p. 47; Doc. 31-9, p. 8, ¶ 17). Mr. Sharpe asserts that Norfolk Southern did not offer him a leniency waiver before his hearing, and he asserts that he would have accepted a waiver. (Doc. 41-1, p. 5, ¶ 9).

similarly situated employees,' and (3) pretext." *Jenkins v. Nell*, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (*Lewis II*)).

Mr. Sharpe relies primarily on Mr. Morton-Black's statements and actions to support an inference of racial bias. "When a claim involves an adverse employment action that occurs based on a biased recommendation by a party without decision-making authority, a plaintiff can establish liability under the cat's paw theory." *Holley v. Ga. Dep't of Corrections*, 845 Fed. Appx. 886, 889 (11th Cir. 2021) (citing *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331–32 (11th Cir. 1999)). "Under that theory, if the decisionmaker followed the biased recommendation without independent investigation—essentially rubber-stamping the biased recommendation—then the recommender's discriminatory animus is imputed to the decisionmaker." *Holley*, 845 Fed. Appx. at 890 (citing *Stimpson*, 186 F.3d at 1332).[7] To establish liability under the cat's paw theory, a plaintiff must prove that the

---

[7] In *Staub v. Proctor Hosp.*, the United States Supreme Court recognized "that when Congress creates a federal tort it adopts the background of general tort law." 562 U.S. 411, 417 (2011). The Supreme Court examined several tort law concepts to decide whether one might allow the plaintiff in that USSERA case to pursue his intentional discrimination claim against his private employer based on a cat's paw theory. The Court has not located a decision in which the Eleventh Circuit has decided the extent to which the analysis in *Staub* reaches beyond a motivating factor claim like a USSERA claim or a Title VII claim brought under 42 U.S.C. § 2000e–2(a), (m) to a "but for" employment discrimination claim brought under Title VII or § 1981 or another employment discrimination statute. The following statement in *Staub* does not hinge on the distinction between "but for" claims and "motivating factor" claims and seems to apply here: "Animus and responsibility for the adverse action can both be attributed to the earlier agent (here, Staub's supervisors) if the adverse action is the intended consequence of that agent's discriminatory conduct." 561 U.S. at 419. That, in a nutshell, is Mr. Sharpe's theory in this case.

supervisor's discriminatory animus "was an actual cause of the other party's decision to terminate the employee." *Stimpson*, 186 F.3d at 1331.

Here, the record does not indicate that Mr. Morton-Black directly recommended to Mr. Yeager that Mr. Sharpe be terminated. Mr. Morton-Black and Mr. Yeager state in their declarations that they "had no substantive discussions" regarding Mr. Sharpe or the charge against him. (Doc. 31-9, pp. 6–7, ¶ 11; *see also* Doc. 31-11, pp. 4–5, ¶ 7). Mr. White testified that he was not present for conversations between Mr. Morton-Black and Mr. Yeager. (Doc. 57-1, p. 16, tp. 54). Nevertheless, viewing the record in the light most favorable to Mr. Sharpe, there is ample evidence from which a jury could find that Mr. Morton-Black's racial animus was the actual cause of Mr. Sharpe's termination.

The evidence indicates that Mr. Morton-Black harbored racial animus towards Mr. Sharpe. Mr. White testified that he and Mr. Morton-Black had several conversations in which Mr. Morton-Black used the "N" word in reference to Mr. Sharpe and told Mr. White that they "need[ed] to find a way to get rid of" Mr. Sharpe. (Doc. 57-1, p. 14, tpp. 47–48; p. 20, tp. 71; p. 21, tpp. 74–75; p. 22, tp. 78). When Mr. White reported to Mr. Morton-Black that he had observed Mr. Sharpe using his cellphone in the breakroom, Mr. Morton-Black remarked: "[f]inally got that nigger" and instructed Mr. White to send Mr. Sharpe home and to

charge him with a cardinal rule violation.  (Doc. 57-1, p. 11, tp. 37; *see also* Doc. 41-2, p. 9, tpp. 26–27).

Mr. Sharpe has presented evidence to contradict Norfolk Southern's assertion that his use of a cellphone in the breakroom violated OR-5.  Mr. White testified that OR-5 "is not applicable in a breakroom or non PPE areas."  (Doc. 57-1, p. 10, tp. 31).  Mr. White stated that he followed Mr. Morton-Black's instruction to charge Mr. Sharpe with a violation of OR-5 for fear that his job would be in jeopardy if he did not.  (Doc. 57-1, p. 20, tpp. 70–71).  Mr. White testified that he did not believe that Mr. Sharpe really violated a cardinal rule when he looked at his cellphone in the breakroom.  (Doc. 57-1, p. 20, tp. 70).

Most importantly, the evidence viewed in the light most favorable to Mr. Sharpe indicates that Mr. Morton-Black orchestrated every step from charging Mr. Sharpe with a cardinal rule violation to terminating him based on that purported violation.  Mr. White testified that he had "a dozen" conversations with Mr. Morton-Black before the charge hearing.  In those conversations, Mr. Morton-Black told Mr. White who to select as a the decisionmaker and advised Mr. White how to communicate with the decisionmaker.  Mr. White testified that Mr. Yeager and Mr. Morton-Black were friends and that Mr. Morton-Black instructed him (Mr. White) to speak with Mr. Yeager before the hearing to ensure that Mr. Yeager would fire Mr. Sharpe.  (Doc. 57-1, p. 19, tp. 68; Doc. 41-2, p. 10, tp. 33).  Mr. White

followed Mr. Morton-Black's instruction.  Mr. Morton-Black edited Mr. White's opening statement. (Doc. 57-1, pp. 12–13, tpp. 39, 41–42; *see also* Doc. 41-2, p. 11, tpp. 34–35).  Mr. Yeager also revised Mr. White's opening statement and coached him on the rules to use during the hearing.  At Mr. Morton-Black's direction, Mr. White—Norfolk Southern's critical witness against Mr. Sharpe—"communicated with the judge, jury, and executioner prior to the trial." (Doc. 57-1, p. 15, tpp. 52–53).  Based on this evidence, a jury could find that Mr. Yeager did not conduct an independent investigation and that Mr. Morton-Black used Mr. White to communicate with Mr. Yeager to ensure Mr. Sharpe's termination.

Finally, given the differences in Norfolk Southern's discipline of Mr. Sharpe and Mr. Paone for the same rule violation, a jury could conclude that Mr. Sharpe would have received discipline short of termination if Mr. Sharpe were white.  Mr. White testified that Mr. Morton-Black wanted to get rid of Mr. Sharpe and Mr. Paone,  (Doc. 57-1, p. 15, tp. 50), yet when Mr. White saw Mr. Paone using a cellphone in the cab of a locomotive in violation of OR-5 and sent Mr. Paone home, Mr. Morton-Black granted Mr. Paone a leniency wavier and suspended him for 30-days, (Doc. 31-9, p. 8, ¶ 17).  Mr. Sharpe did not receive a leniency waiver.  Mr. Morton-Black asserts that Mr. Sharpe did not request a waiver, but Mr. Sharpe has pointed to evidence that charging officers ordinarily offer a waiver to a charged employee. (Doc. 35-1, p. 38, tp. 145; *see also* Doc. 31-5, p. 31, tp. 114).  Moreover,

Mr. Paone's use of a cellphone in the cab of a locomotive is more dangerous than Mr. Sharpe's use of a cellphone in a breakroom.   From this evidence, a jury reasonably could conclude that Mr. Morton-Black did not offer Mr. Sharpe a leniency waiver for Mr. Sharpe's purported (non-egregious) OR-5 violation because of Mr. Sharpe's race.[8]

Combined, this evidence permits a jury to reasonably infer that Mr. Morton-Black harbored a strong racial animus against Mr. Sharpe; Mr. Morton-Black knew that an established cardinal rule violation would lead to Mr. Sharpe's termination; Mr. Morton-Black directed Mr. White to charge Mr. Sharpe with a cardinal rule violation; Mr. Morton-Black scripted Mr. Sharpe's charge hearing; and Mr. Sharpe would not have been subjected to a charge hearing and terminated for looking at his cellphone in a Norfolk Southern breakroom but-for his race.   Put differently, there is sufficient evidence that Mr. Yeager merely rubber-stamped Mr. Morton-Black's biased recommendation for Mr. Sharpe's termination such that the evidence permits a jury to impute Mr. Morton-Black's discriminatory animus to the decisionmaker, Mr. Yeager.  *Holley*, 845 Fed. Appx. at 890.

---

[8] To the extent Norfolk Southern argues that Mr. Sharpe would not have received a leniency waiver because of his "last chance" agreement, Mr. Sharpe's disciplinary record shows that he received disciplinary write-ups after Norfolk Southern reinstated him on a "last chance" basis.  Specifically, Mr. Sharpe's disciplinary record shows that following his reinstatement in September 2017, he accepted responsibility for two START minor violations and one START serious violation and received two letters of caution.  (Doc. 31-2, p. 9).  Based on this evidence, a jury reasonably could conclude that Mr. Sharpe's "last chance" agreement was not the real reason why he did not receive a leniency waiver.

## IV.

Based on the forgoing, the Court denies Norfolk Southern's motion for summary judgment.  (Doc. 32).  By separate order, the Court will set this case for trial.

**DONE** and **ORDERED** this April 4, 2024.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE